IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LARRY WATSON,

    Petitioner,                   No. 2: 09-cv-1855 FCD KJN P

    vs.

JAMES D. HARTLEY,

    Respondent.               FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

        Petitioner is a former state prisoner proceeding without counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2007 conviction for two counts of dissuading a witness by force or threat (Cal. Penal Code § 136.1(c)(1)), two counts of assault with a firearm (Cal. Penal Code § 245(a)(2)), felony child abuse (Cal. Penal Code § 273a(a)), stalking (Cal. Penal Code § 646.9(a)), false imprisonment (Cal. Penal Code §§ 236, 237), brandishing a loaded firearm (Cal. Penal Code § 417(b)), and knowingly violating a court order (Cal. Penal Code § 273.6(a)). On appeal, petitioner's sentence was modified to seven years and four months.

        This action is proceeding on the amended petition filed November 30, 2009. (Dkt. No. 14.) The amended petition raises the following claims: 1) insufficient evidence

(2 claims); and 2) violation of California Penal Code § 654.

After carefully considering the record, the undersigned recommends that the petition be denied.

II. Anti-Terrorism and Effective Death Penalty Act ("AEDPA")

In Williams (Terry) v. Taylor, 529 U.S. 362 (2000), the Supreme Court defined the operative review standard in a habeas corpus action brought pursuant to 28 U.S.C. § 2254. Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. Id. at 405. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law; or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Id. at 407-08. It is this prong of the AEDPA standard of review which directs deference be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law. . . . [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 410-11 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19 (2002).

////

"Clearly established" law is law that has been "squarely addressed" by the United States Supreme Court. Wright v. Van Patten, 552 U.S. 120 (2008). Thus, extrapolations of settled law to unique situations will not qualify as clearly established. See e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006) (established law not permitting state sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly established law when spectators' conduct is the alleged cause of bias injection).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority, in arriving at their decision. Early v. Packer, 537 U.S. 3 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority. Id. An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003). Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. at 9.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

When reviewing a state court's summary denial of a claim, the court "looks through" the summary disposition to the last reasoned decision. Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).

////

III. <u>Background</u>

The opinion of the California Court of Appeal contains a factual summary. After independently reviewing the record, the undersigned finds this summary to be accurate and adopts it herein.

> Defendant lived on a rural property in Grass Valley with his wife of 19 years, J.W., and his 17-year-old daughter, A.W. The property had two residences, a main house in which A.W. slept, and a "granny" house in which defendant and J.W. resided during renovations to the main house.
>
> On August 29, 2005, defendant was depressed and under considerable stress so J.W. stayed home to help him. J.W. made dinner, but defendant did not like it so he told her to make dinner again. J.W. complied and went to the store get more ingredients. After his wife left for the store, defendant started to yell at his daughter for lacking respect along with being irresponsible and ungrateful. He eventually hit A.W. hard on the arm and grabbed her by the jaw and neck, hurting and scaring her.
>
> A.W. called a friend and used a prearranged code word to have the friend call the police. The police arrived and A.W. told them about the incident, but they left after examining her and finding no bruises.
>
> Defendant asked A.W. what she told the police. After finding out what she had said, defendant told A.W. she should not have done that as it could get him in a lot of trouble.
>
> Defendant's 50th birthday was on August 31, 2005. That morning, A.W. and J.W. presented birthday cards to defendant but he returned them, claiming his wife's card was derogatory and his daughter had not spent enough time on hers. Defendant then took A.W. to school, but returned home with her because she said something sarcastic to him in the parking lot.
>
> A.W. and J.W. spent the day doing chores and working on the cards. Defendant was angry nothing had been done for his birthday, so A.W. and J.W. decided to decorate their picnic table and barbecue some steaks. Defendant was too tired and groggy to leave the granny house, so they brought the meal indoors to him.
>
> Defendant yelled during dinner and drank a gin and tonic. He had a total of five or six that night, eventually drinking straight gin.
>
> Defendant became angrier after dinner, complaining first about what A.W. said in the school parking lot, and then bringing up an incident earlier in the summer in which unknown friends of hers

had strewn toilet paper over the outside of the house. As his anger over the toilet paper incident escalated, defendant grabbed his daughter by the head and shook her. After J.W. told defendant to stop, he turned around, grabbed his wife by the shoulders, and pinned her down on the couch, telling her to stay out of it.

Defendant was yelling about how dangerous it was to toilet paper the house in this rural area as most people had guns. He brought out a locked metal box, opened it, and took out a semiautomatic handgun. Waving the gun around, defendant reiterated to A.W. the dangers of trespassing in Grass Valley as so many people have guns. The gun was cocked, loaded, and crossed the path of A.W.'s and J.W.'s bodies as defendant continued to tell A.W. how one could easily get shot in this area.

Testifying about defendant's use of the gun, A.W. stated "it crossed in front of me, it could have shot me if it had gone off." Defendant was talking with his hands as he held the gun rather than pointing it directly at anybody. He was between one and one and one-half feet from A.W. as defendant waved the loaded pistol.

Defendant opened the top part of the handgun and flipped out all of the bullets, leaving them on the floor. He told his daughter the bullets were hollow points which could blow her head off. He then took a different pistol, a revolver, out of the metal box and placed the barrel at A.W.'s temple, saying he wanted A.W. to know how it feels. A.W. sat there crying as he held the gun to her head, not knowing whether it was loaded.

J.W. exclaimed to defendant, "What are you doing? Are you crazy?" He leaned over and put the gun on J.W.'s temple with enough force to push her over. Like her daughter, J.W. did not know whether the revolver was loaded at this point. Defendant took the gun from J.W.'s head, opened it up, and spun the barrel to show it was not loaded, saying he would not have done this had the gun been loaded. Defendant then locked up the guns and put them away.

After putting the guns away, defendant told A.W. and J.W. if they told anyone he would kill them, and if jailed, he would hunt them down and kill them once he got out. He then sent them upstairs to go to bed, where the two sat in fear for their safety.

Defendant eventually came upstairs and said they could not leave because the phones were disconnected and he had turned on the alarm system. He told them if the police came they were to say everything was fine and not say what had happened.

The next morning A.W. informed the authorities after her mother had arrived safely at work. Defendant was arrested, read his <u>Miranda v. Arizona</u> (1966) 384 U.S. 436 warnings, and

interviewed at jail. He told the deputy that he did not understand much of what happened yesterday as he had taken four to five Xanax pills and consumed six to eight gins. Defendant remembered talking to his daughter about the toilet paper incident and getting very angry, admonishing her that she could get shot if she did something like that. The guns were taken out to scare his daughter, but defendant first made sure they were empty. An emergency protective order was obtained and served on defendant while he was in jail.

The day after the incident, A.W. and J.W. went to a local motel under a fictitious name. Knowing defendant had been arrested and made bail they used a car cover to hide their car in the motel parking lot. They went to bed, and at around 4:00 or 4:30 a.m. were awakened by knocking on the door.

J.W. went to the door and looked in the peephole, which was covered by a finger. Afraid, J.W. stood by the door for five to seven minutes. The finger was removed from the peephole, revealing defendant as the person knocking on the door. J.W. went straight to the phone and dialed 911. After several more minutes of knocking, they heard a truck drive away.

A deputy was dispatched to the motel and defendant was pulled over after his truck was spotted leaving the motel parking lot. Defendant first said he was looking for a place to stay but eventually admitted wanting to talk to his wife and daughter. He told the deputy he did not know what type of court order he had been given, but knew he was not supposed to be around his wife or daughter. A copy of the emergency protective order and a car cover were found in defendant's truck.

J.W. and A.W. testified to physical and emotional abuse committed by defendant against J.W. during their marriage. She had previously obtained a restraining order against defendant and left him, but defendant talked her into returning.

An expert testified on domestic violence. Domestic violence involves an ongoing pattern of coercion and intimidation designed to control the victim. The abuse is much more emotional than physical, and it is common for the victim to leave the perpetrator and return. None of the expert's testimony was based on the facts of the case or a review of the files.

Defendant's mother, testifying for the defense, stated her son did not seem right and was barely able to speak when she called him on his birthday. According to his physician, defendant had been prescribed Xanax for his anxiety. Among the side effects for the drug were drowsiness, sleepiness, and loss of consciousness, as well as irritability, confusion, and a lack of coordination. Mixing five to six drinks with Xanax could easily lead to profound

| | |
|---|---|
| 1 | drowsiness or becoming unconscious. |
| 2 | Defendant denied cutting the phone lines or saying he would hunt down his wife and daughter or kill them. While he admitted to talking to A.W. about the danger of vandalism at his birthday dinner, defendant denied grabbing or shaking her. He claimed to have had only one drink at dinner and was sober when he showed the guns to A.W. He took out the guns to make an impression on her, and made sure they were unloaded first. The second gun defendant took out, the revolver, was never directly pointed at A.W. |
| 7 | As he was showing the second gun, J.W. ran to defendant and pushed him down, causing a scuffle. Defendant claimed he held the gun in one hand and grabbed his wife's shoulder with the other, causing the side of the gun barrel to incidentally touch her head. |
| 9 10 | Defendant asserted he never deliberately pointed a weapon at either J.W. or A.W., and made sure to tell them they were unloaded. He was only trying to tell her not to vandalize property. |
| 11 12 | Defendant also denied ever abusing his wife and could not recall being given a protective order at jail. He was looking for a place to sleep when he went to the motel. |

(Respondent's Exhibit A, at 2-8.)

IV. Discussion

    A. Alleged Insufficient Evidence:   Claims 1 and 2

*Legal Standard*

When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that upon the record evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found "the essential elements of the crime" proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Jackson established a two-step inquiry for considering a challenge to a conviction based on sufficiency of the evidence. U.S. v. Nevils, 598 F.3d 1158, 1164 (9th Cir. 2010). First, the court considers the evidence at trial in the light most favorable to the prosecution. Id., citing Jackson, 443 U.S. at 319. "'[W]hen faced with a record of historical facts that supports conflicting inferences," a reviewing court 'must presume – even if it does not affirmatively

appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" Id., quoting Jackson, 443 U.S. at 326.

"Second, after viewing the evidence in the light most favorable to the prosecution, a reviewing court must determine whether this evidence so viewed is adequate to allow 'any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" Id., quoting Jackson, 443 U.S. at 319. "At this second step, we must reverse the verdict if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact finders would have to conclude that the evidence of guilt fails to establish every element of the crime beyond a reasonable doubt." Id.

Superimposed on these already stringent insufficiency standards is the AEDPA requirement that even if a federal court were to initially find on its own that no reasonable jury should have arrived at its conclusion, the federal court must also determine that the state appellate court could not have affirmed the verdict under the Jackson standard in the absence of an unreasonable determination. Juan H. v. Allen, 408 F.3d 1262 (9th Cir. 2005).

*Claim 1*

Petitioner alleges that there was insufficient evidence to support his conviction for felony child abuse. The California Court of Appeal denied this claim for the reasons stated herein:

> Defendant contends there is insufficient evidence to support his conviction for felony child abuse. We disagree.
>
> In determining whether the evidence is sufficient to support a conviction, the court must review "the whole record in the light most favorable to the judgment" and decide "whether it discloses substantial evidence ... such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (People v. Johnson (1980) 26 Cal.3d 557, 578.)
>
> "Under this standard, the court does not "'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt.' [Citation.]" (People v. Hatch (2000) 22 Cal.4th 260, 272, italics omitted.)

As relevant to this case, pursuant to section 273a, subdivision (a), it is a crime for "[a]ny person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering...." The felony child endangerment statute is "'"intended to protect a child from an abusive situation in which the probability of serious injury is great." [Citation.]'" (People v. Valdez (2002) 27 Cal.4th 778, 784 (Valdez).) To support his contention, defendant argues his acts were not sufficiently likely to result in death or serious injury.

The parties differ over the meaning of the term "likely" in the context of section 273a. Defendant contends the felony child endangerment statute is "'"intended to protect a child from an abusive situation in which the probability of serious injury is great." [Citation.]'" (Valdez, supra, 27 Cal.4th 778, 784; People v. Sargent (1999) 19 Cal.4th 1206, 1216.) The Attorney General counters by arguing these statements are dicta, and viewed in the context of the purpose of the legislation, protecting vulnerable children, "likely" is defined as "a substantial danger, i.e., a serious and well-founded risk, of great bodily harm or death." (People v. Wilson (2006) 138 Cal.App.4th 1197, 1204.)

There is sufficient evidence to support the jury's verdict under either definition of the term. An obviously angry defendant, having consumed alcohol and Xanax, waved a loaded, cocked, semiautomatic pistol less than two feet from his daughter, allowing it to cross the path of her body, which presented a profound danger to A.W.

There are many dangerous possibilities inherent to this scene. The gun could accidentally discharge, a particular danger as defendant had been drinking and taking antidepressants. It is also possible that A.W. or J.W., already frightened by defendant's behavior, could have struggled with him for the gun causing it to discharge. Since the weapon was at point-blank range and crossed the path of A.W.'s body, defendant's action carried a great risk of death or serious bodily injury to her.

We are not persuaded by defendant's contention that this ruling violates his due process rights. Holding defendant liable for his reckless behavior, which endangered his daughter's life, does not render the child endangerment statute vague nor does it deprive defendant of fair notice. Accordingly, we conclude defendant's conviction for felony child abuse is supported by substantial evidence.

(Respondent's Exhibit A, at 8-11.)

The undersigned agrees with the reasoning of the California Court of Appeal that there was sufficient evidence to support petitioner's conviction for child abuse. His daughter, Ashley, testified that petitioner waived a loaded gun around and that petitioner could have shot her:

> Q: Let me ask you the next question. Did he do anything with that gun?
>
> A: He cocked the gun and was waving it around, just, I mean, he was using hand movements while he was talking, the gun was in his hand, so it was waving around the room, and he was just saying that it's dangerous to be vandalizing in this area because you could get shot easily.
>
> Q: Did he – you said he was waving it around, when he was waving it around, did you feel that it ever kind of crossed the path of your body?
>
> A: Yes.
>
> Q: Did it ever cross the path of your mother's body?
>
> A: Yes.
>
> Q: And you know what I mean by that?
>
> A: It crossed in front of me, that it could have shot me if it had gone off.
>
> Q: Yes. Did you believe it did that?
>
> A: Yes.
>
> Q: And also for your mother?
>
> A: Yes.
>
> Q: Can you kind of describe or show us with your hands the way he was waving it around.
>
> A: Well, I mean, he was just talking and using his hands a lot, I mean, just talking, you know how people use hand movements, and I mean it was everywhere, up and down and sideways, and it wasn't like a certain path and he wasn't pointing it directly at anybody.

1    Q: So he never kind of did a stance or anything like that?

2    A: No.

3    Q: But he was waving it around?

4    A: Yes.

5    Q: Was it making you nervous?

6    A: Yes.

7    Q: Did you say anything to him about that?

8    A: No. We were just, everybody was just really upset, we weren't – I mean, no, I didn't say anything.

9

10   Q: When you say everybody was upset, what do you mean by that?

11   A: My mom and I were both crying a lot, and my dad was yelling and he was really red in the face and just, it was really tense I guess.

12

13   Q: All right. So after he waved around the black gun, what did he do next?

14   A: He did something to flip the bullets out of the back and they just went onto the floor in the living room.

15

16  (RT, at 322-24.)

17  Ashley went on to testify how petitioner then pointed a gun to her head and then

18  to her mother's head. (RT, at 324-25.) At that time, she did not know whether it was loaded.

19  (RT, at 325.) It turned out to be unloaded.

20  The undersigned agrees with the California Court of Appeal that defendant's

21  waiving of a loaded gun across the path of his daughter's body, while he was under the influence

22  of alcohol and Xanax, presented a profound danger to her. A reasonable jury could have found

23  that petitioner's conduct was sufficiently likely to result in death or serious injury.

24  After conducting an AEDPA review, the undersigned recommends that this claim

25  be denied.

26  ////

*Claim 2*

Petitioner alleges that there was insufficient evidence to support his convictions for assault with a firearm. The California Court of Appeal denied this claim for the reasons stated herein:

> Defendant contends his convictions for assault with a firearm are not supported by substantial evidence. We are not persuaded.
>
> In order to prove assault with a firearm, a general intent crime, a person must have been assaulted and the assault must have been committed with a firearm. One can commit the crime without actually discharging the firearm. (People v. Colantuono (1994) 7 Cal.4th 206, 219 (Colantuono).) Holding up a fist in a menacing manner or presenting a gun at someone who is within range constitutes assault. (Ibid., citing People v. McMakin (1857) 8 Cal. 547, 548.) "[A]ny other similar act, accomplished by such circumstances as denote an intention existing at the time, coupled with a present ability of using actual violence against the person of another, will be considered an assault." (Colantuono, supra, at p. 219, italics omitted.) Nor must the prosecution prove that defendant made an attempt to use the weapon upon the person of another. (People v. McCoy (1944) 25 Cal.2d 177, 189.)
>
> The focus of section 245 "'is the likelihood that the force applied or attempted to be applied will result in great bodily injury.' [Citation.]" (Colantuono, supra, 7 Cal.4th at p. 217, italics omitted.) Therefore, "[t]he pivotal question is whether the defendant intended to commit an act likely to result in such physical force, not whether he or she intended a specific harm." (Id. at p. 218.)
>
> As we have already discussed, defendant's actions created an unacceptably high risk of death or great bodily injury to A.W. by waving a loaded, cocked pistol in front of her body at point-blank range. The same applies to J.W., who also had the pistol waved across her body by the angry, possibly intoxicated defendant. His convictions are supported by substantial evidence.

(Respondent's Exhibit A, at 11-12.)

For the reasons stated by the California Court of Appeal, the undersigned finds that there was sufficient evidence to support petitioner's assault convictions. The evidence demonstrated that petitioner intended to waive a loaded gun, in close range, in front of his wife and daughter. As discussed above, his daughter testified that he could have shot her or her

1 mother. Based on the evidence presented at trial, a reasonable jury could have found that
2 petitioner intended to use the gun in a manner which was likely to have resulted in great bodily
3 injury to his wife and daughter.
4       After conducting an AEDPA review, the undersigned recommends that this claim
5 be denied.
6       B.  <u>Claim 3: Alleged Violation of California Penal Code § 654</u>
7       Petitioner argues that his consecutive sentence for his stalking conviction violated
8 California Penal Code § 654. The California Court of Appeal denied this claim for the reasons
9 stated herein:

> Section 646.9 provides, in pertinent part, "(a) [a]ny person who willfully, maliciously, and repeatedly follows or harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family, is guilty of the crime of stalking...."
>
> Defendant contends his sentence for stalking should have been stayed under section 654 because the crime, which involves repeated acts, necessarily involves both the incident at the motel and the acts committed by defendant which led to his conviction on the other charges. He is mistaken.
>
> Section 654, subdivision (a), provides in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."
>
> Defendant contends section 654 applies to his sentence, as is "clearly illustrated" by <u>People v. Shelton</u> (2006) 37 Cal.4th 759. In <u>Shelton</u>, the Supreme Court addressed a single issue, holding that a certificate of probable cause was necessary to challenge a court's authority to challenge a "lid" sentence after a guilty plea. (<u>Id</u>. at p. 763.) The Supreme Court never addressed the relationship between the stalking statute and section 654, and defendant's contention to the contrary is specious.
>
> It is clear the stalking conviction can be based on acts separate from those used to support the other convictions. The incidents with the unloaded revolver and at the motel support a stalking conviction but were not related to the child endangerment, assault with a firearm, false imprisonment, or brandishing convictions.

1             Defendant's claim is therefore without merit.
2  (Respondent's Exhibit A, at 12-13.)
3             Federal habeas relief is only available for violations of the United States
4  Constitution or federal law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); see also
5  Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (habeas relief is not available for state
6  law errors that are not of a constitutional dimension).  Accordingly, petitioner's claim alleging a
7  violation of California Penal Code § 654 is not cognizable in this action.  See Cacoperdo v.
8  Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) ("The decision whether to impose sentences
9  concurrently or consecutively is a matter of state criminal procedure and is not within the
10 purview of federal habeas corpus."); Watts v. Bonneville, 879 F.2d 685, 687 (9th Cir. 1989)
11 (alleged violation of section 654 is state law claim not cognizable in federal habeas proceeding).
12            After conducting an AEDPA review, the undersigned recommends that this claim
13 be denied.
14 Conclusion
15            For all of the above reasons, the undersigned recommends that petitioner's
16 application for a writ of habeas corpus be denied.  If petitioner files objections, he shall also
17 address whether a certificate of appealability should issue and, if so, why and as to which issues.
18 A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a
19 substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).
20            Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a
21 writ of habeas corpus be denied.
22            These findings and recommendations are submitted to the United States District
23 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-
24 one days after being served with these findings and recommendations, any party may file written
25 objections with the court and serve a copy on all parties.  Such a document should be captioned
26 "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: November 24, 2010

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

wat1855.157

15